UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BROWARD DIVISION

CASE NO. 00-CV-6121-CIV-DIMITROULEAS

Magistrate Judge Johnson

MASHAAN GUY, and JACQUELINE
GUY,

      Plaintiffs,

vs.

MIAMI-DADE POLICE DEPARTMENT, et al.,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE TO
DEFENDANT SISLEY'S MOTIONS TO
<u>DISMISS AND FOR SUMMARY JUDGMENT</u>**

**<u>Standard of Review</u>**

      Sisley moves for summary judgment on the basis of qualified immunity. Plaintiffs

have controverted by their affidavits, attached, and by their Statement of Material Facts

filed herewith, all statements of fact on which Sisley's qualified immunity defense rests.

"At this stage, factual disputes are resolved by accepting the plaintiff's version of the facts,"

<u>Andreu v. Sapp</u>, 919 F.2d 637, 639 (11th Cir. 1990), and by construing those facts "in the

light most favorable to [the] plaintiff." <u>Sheth v. Webster</u>, 145 F.3d 1231, 1238 (Fla. 11th Cir.

1998).



## Facts

Mr. Guy, a Miami Dolphins season ticket holder, was invited by the Miami Dolphins football club to attend a game that the Dolphins were playing against the Denver Broncos at Pro Player Stadium. He invited a friend, Ronnie Smith, to meet him at the Stadium and attend the game with him. Mr. Guy parked his car at a Golden Glades interchange lot and took the shuttle bus to the Stadium where he waited near one of the numerous gates into the Stadium proper for his friend to arrive.

Defendant Robert Sisley, an off-duty Miami-Dade police officer, was privately employed and paid by South Florida Stadium Corporation as a security guard on the evening of the game. While Mr. Guy was standing quietly alone, observing the pregame activities and not speaking to or interacting with the crowds of people around him, Sisley approached him and told him "I know what you are doing, I don't like what you are doing and get out of here." Mr. Guy had no idea what Sisley was talking about but learned after his arrest that he was accused of yelling "watch out" to a group of ticket scalpers as Sisley approached. Mr. Guy had not in fact said "watch out" or warned anyone of anything or participated in the resale of tickets.

Sisley refused to explain to Mr. Guy why he was demanding that Mr. Guy leave the premises. Mr. Guy displayed his tickets to Sisley and told Sisley he was a season ticket holder waiting to meet a friend. Sisley told Mr. Guy to either enter the Stadium or leave the premises. Mr. Guy explained that if he entered the Stadium he would miss his friend, and he could not leave the premises because the shuttle buses were not returning to the Golden Glades parking lot, where he had left his car, until after the game.

2

At that point Sisley, without warning, and without ever advising Mr. Guy that he would be arrested for trespassing if he did not leave, placed Mr. Guy under arrest. He grabbed Mr. Guy around the neck in a choke hold and with force accompanied by pain pulled Mr. Guy's arms behind his back and tightly handcuffed him. He pulled back on the handcuffs inflicting further pain forcing Mr. Guy to arch his back to relieve the pressure. In response to Mr. Guy's complaint that the handcuffs were too tight and were cutting into his wrists, Sisley responded, "Tough, they're not built for comfort."

Sisley forcibly pushed Mr. Guy down onto the back seat of a golf cart driven by another officer. At the holding cell area of the Stadium Sisley forcibly sat Mr. Guy down on a bench. While he was seated Mr. Guy leaned forward as far as he could to relieve the severe pain caused by the handcuffs and the pressure his handcuffed arms placed on his shoulder. While being led from place to place Sisley pulled up on Mr. Guy's handcuffs intensifying the pain and causing Mr. Guy to contort his body to attempt to relieve the pain.

During his over-long processing, Mr. Guy again complained to Sisley that the handcuffs were too tight. He complained that his fingers were tingling and it felt as though his shoulder was coming out of its socket. Sisley still refused to loosen the handcuffs, saying "I already told you. I gave you that answer." During this entire period of time Sisley acted angrily, vengfully and harshly.

After approximately two hours of pain, Mr. Guy was transferred by Sisley to the custody of guards driving a prisoner van. One of these guards at Mr. Guy's request finally loosened the handcuffs.

Mr. Guy initially had deep grooves on his wrists. His wrists remained red and sore for several days after this incident and his shoulder hurt for a considerable period of time.

3

Although Mr. Guy's shoulder no longer is in constant pain, it has not felt the same since the incident. Mr. Guy has also experienced significant psychological distress as a result of the incident.

**Law**

Sisley is not entitled to qualified immunity as a matter of law for several reasons in addition to the reason that all his assertions of material fact have been controverted by the plaintiff.

**1.**

**Sisley, while functioning as a private
security guard for a private employer,
is not entitled to qualified immunity**.

In <u>Richardson v. McKnight</u>, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), guards employed by a private prison were sued by an inmate under 42 U.S.C. §1983 for placing him in extremely tight physical restraints. The Supreme Court, following a historical analysis, found "nothing special enough about the job or about its organizational structure that would warrant providing these private prison guards with a governmental immunity." 521 U.S. at 412, 117 S.Ct. at 2107.

The Court found no "firmly rooted" tradition of immunity for privately employed prison guards. 521 U.S. at 404; 117 S.Ct. at 2104. The most important reason for immunity, deterring "unwarranted timidity" by governmental employees in the performance of their duties, was absent. The Court reasoned that "ordinary marketplace pressures" sufficiently provided the private prison and its employees with strong incentives to be effective and efficient while the protection of private insurance freed them from an

4

excessive fear of lawsuits. Another concern, that if there were no immunity talented applicants would be driven away from public service out of fear of lawsuits, was also found to be absent in a private employer context. 521 U.S. at 409-412; 117 S.Ct. at 2106-2107.

Richardson was followed in Payton v. Rush-Presbyterian-St.Luke's Med. Ctr., 2000 U.S. Dist. Lexis 972 (N.D. Ill. January 27, 2000). In Payton, qualified immunity for an assault on a visitor was denied to members of a "hybrid public/private police force" responsible for security at a private hospital. The court found that the case for denying qualified immunity was even stronger for employees of a private hospital than for the employees in Richardson who, by operating a prison, were engaged in "a major administrative task for the government." Slip Op. at 18. Indeed, the court noted, "the presumption is against immunity for private actors unless tradition and strong policy reasons dictate conferring immunity." Id.

Here, Sisley was off-duty and employed and paid as a private security guard by South Florida Stadium Corporation which was not performing a governmental function. Sisley simply was enforcing his private employer's private policies either against ticket resales ("the Stadium does not allow the resale of tickets and routinely makes announcements to the affect [sic] over the loudspeaker." Sisley Aff., ¶10), or trespass ("enter the stadium or leave the property" Sisley Aff. ¶10).

The trespass statute under which Mr. Guy was charged, §810.08, Fla. Stat., "was passed by the Legislature to assist the property owner in the protection of his property." See Plaintiffs' Response to the Stadium Defendants' Motion to Dismiss, at 7-8. Under §810.08(1), Sisley was thus acting as the private agent of a private owner or, in the terms of the statute, as "a person authorized by the owner or lessee" to warn persons either to

enter the Stadium or to depart. Viewed conversely, Sisley would have had no inherent authority as a police officer, even if he had been "on duty," to enforce §810.08 on the Stadium's premises without the Stadium's prior authorization. The fact that the Stadium had delegated its personal statutory authority to warn trespassers to an off-duty police officer could not convert that officer's private warning into an act of public law enforcement. Under a Richardson analysis, Sisley is not entitled to summary judgment on the issue of qualified immunity. See Lusby v. T.G.&Y. Stores, Inc., 749 F.2d 1423, 1432 (10th Cir. 1984)(city policeman acting as off-duty security guard not entitled to qualified immunity while working in his private capacity), vacated on other grounds, 474 U.S. 805 (1985), reaffirmed on remand, 796 F.2d 1307 (10th Cir. 1986). Cf. Soverino v. State, 356 So.2d 269, 272 (Fla. 1978)("When an officer is not performing his official duties, he is no longer protecting the public welfare and, consequently, the [assault and battery on a police officer] statute yields him no greater protection than that accorded to members of the general public").

Reasonable police investigative standards would have required Sisley to negate Mr. Guy's season-ticket-holder status, the fact that his car was not in the Stadium parking lot, and that he was expecting a friend – all factors strongly disproving ticket scalping or trespass – before ordering Mr. Guy off the premises and before arresting him. Sisley, however, wearing the hat of a private security guard, was indifferent to these minimal public investigative responsibilities. Sisley's failure to conduct even the cursory investigation a reasonable on duty police officer would have conducted before or after arresting Mr. Guy creates fact questions about the reasonableness of his actions and whether he was performing a public or private function in his confrontation with Mr. Guy.

See Lusby, 749 F.2d at 1432 (city policeman/off duty security guard not entitled to qualified immunity while working in a private capacity and "even if he qualified for such immunity once he slipped into his police role during the T.G.&Y. incident, he forfeited it by acting unreasonably when he [failed to] investigate the alleged shoplifting [before arresting the plaintiff]").

**2.**

**Sisley is not entitled to qualified immunity
because he has not proved that he was
acting within the scope of his official
duties and discretionary authority.**

Before any other qualified immunity issues may be addressed, Sisley had the initial burden of proving by "objective circumstances which ... compel the conclusion" that his encounter with Mr. Guy was undertaken pursuant to the performance of his official duties and within the scope of his official authority. Lenz v. Winburn, 51 F.3d 1540, 1545-1546 (11th Cir. 1995); Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988). Sisley has not sustained this burden.

The same factual considerations that inform a Richardson analysis compel the conclusion that Sisley's private acts on behalf of his private employer were simply not part of his official duties or within his official authority. Indeed, this conclusion follows as a matter of definition: an "off duty" officer like Sisley, who is employed and paid for his services by a private employer, is presumptively not acting in an official capacity when he enforces his employer's in-house rules and policies and acts as the property management agent for his employer under §810.08. See Lusby, 749 F.2d at 1432 (city policeman acting as off-duty security guard not entitled to qualified immunity while working in his

private capacity). Cf. Soverino, 356 So.2d at 272 (an officer who is not performing a public function is not entitled to a public officer's protections).

**3.**

**Sisley violated Mr. Guy's Fourth
Amendment rights by using excessive force.**

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him]." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). A proper application of the "reasonableness" test

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

490 U.S. at 396; 109 S.Ct. at 1872.

None of the Graham v. Connor factors are present in this case. The crime – if it was one – for which Mr. Guy was allegedly arrested was trivial; Mr. Guy was totally cooperative and posed no threat to the safety of Sisley or any other person; and Mr. Guy neither resisted arrest nor tried to flee. Under these circumstances, Sisley was not entitled to use any force. Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998). Sheth v. Webster, 145 F.3d 1231, 1238 (11th Cir. 1998). Thornton and Sheth apply the rule that where there is no justification for any use of force, then any force used is per se excessive and unlawful.

Thornton and Sheth also represent an application of the principle that a rule of law can be "clearly established" for qualified immunity purposes by reference to general

8

statements of the law even when the specific conduct in question has not previously been held unlawful. United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 132 L.Ed.2d 432 (1997)(interpreting 18 U.S.C. §242 which employs the same immunity standards as 42 U.S.C. §1983); Jenkins v. Talladega Bd. of Ed., 115 F.3d 821, 825 (11th Cir. 1997)(en banc)("general principles of law can provide fair warning [when] the constitutional rule at issue may be applied 'with obvious clarity'"), cert. denied, 522 U.S. 966 (1997). See Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993)("no reasonable officer could believe that the abusive application of handcuffs was constitutional.") Here, Sisley should have known that his course of physically abusive conduct toward Mr. Guy was unwarranted by any Fourth Amendment factors. Summary judgment on Sisley's claim of qualified immunity must be denied.

### 4.

### Sisley violated Mr. Guy's Fourteenth Amendment rights by using excessive force.

At some point between the time Sisley grabbed Mr. Guy in a choke hold and the time, approximately two hours later, when another officer loosened Mr. Guy's painful handcuffs, Mr. Guy's status changed from arrestee to pretrial detainee. Upon achieving the latter status, Mr. Guy's rights were protected by the Fourteenth Amendment, not the Fourth Amendment. Graham v. Connor, 490 U.S. at 395 n.10; 109 S.Ct. at 1871 n.10. The Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." Id. Accord Bell v. Wolfish, 441 U.S. 520, 535-537, 99 S.Ct. 1861, 1872-1873, 60 L.Ed. 2d 447 (1979); McMillan v. Johnson, 88 F.3d 1554, 1564 (11th Cir.

1996), <u>amended on other gds</u>, 101 F.3d 1363 (11th Cir. 1996), <u>cert. denied</u>, <u>sub nom</u>,

<u>McMillian v. Tate</u>, 521 U.S. 1121 (1997).

The test for whether a condition of pretrial detention constitutes punishment under

the Fourteenth Amendment is stated in <u>McMillian</u>, 88 F.3d at 1564:

> To determine whether a condition of pretrial detention amounts to punishment, we must decide whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate governmental purpose.... [A] showing of an intent to punish suffices to show unconstitutional pretrial punishment.... An intent to punish may be inferred when a condition of pretrial detention is not reasonably related to a legitimate governmental goal; for example, an intent to punish may be inferred when the condition is excessive in relation to the legitimate purposes assigned to it.
> ...An express purpose to punish establishes unconstitutional pretrial punishment. [Citations omitted.]

The two hours of painfully tight handcuffs that cut off circulation to Mr. Guy's fingers, cut

into his wrists and forced him to contort his body to lessen the severe pain in his shoulder,

constituted unlawful punishment. Sisley had no legitimate governmental objective for

inflicting that pain on Mr. Guy. Indeed, Sisley's intent to punish and inflict pain on Mr. Guy

is inferrable from his persistent refusal to loosen Mr. Guy's handcuffs – which another

officer promptly did after Mr. Guy left Sisley's custody – and from his callous and flippant

responses when Mr. Guy complained of pain from the handcuffs ("Tough, they're not built

for comfort").

Whether a rule of law is "clearly established" with respect to Fourteenth Amendment

claims is resolved by the same considerations previously discussed with respect to Fourth

Amendment claims. Because <u>Bell v. Wolfish</u> and <u>Graham v. Connors</u> prohibit "<u>any</u> pretrial

punishment, defined to include conditions imposed with an intent to punish," it should have

10

been obvious to any reasonable officer in Sisley's place that any intentional infliction of pain, e.g., refusing to loosen Mr. Guy's painful handcuffs, violated Mr. Guy's Fourteenth Amendment rights.  McMillian, 88 F.3d at 1565.

Gold v. City of Miami, 121 F.3d 1442 (11th Cir. 1997), cert. denied, 525 U.S. 870 (1998), is distinguishable.  There the officers did have arguable probable cause to arrest Gold for his undisputed profanities, and his handcuffs were loosened after only 20 minutes.  Gold also does not involve an arrest initiated with a choke hold and attended by continuing physical indignities, inflictions of pain, and the arrestee's protests of not only wrist pain but finger numbness and excruciating shoulder pain from the handcuffs. Moreover, Gold's claims of excessive force for tight handcuffing, because of the brevity of the incident, were only brought under the Fourth Amendment, not the Fourteenth.  A punitive intent, of the type exhibited by Sisley, but not by the officers in Gold, is relevant under a Fourteenth Amendment analysis but not under a Fourth Amendment analysis. Graham v. Connor, 490 U.S. at 397-398, 109 S.Ct. at 1872-1873.  Sisley simply is not entitled to summary judgment on qualified immunity grounds.

**5.**

### Sisley lacked arguable probable cause to arrest Mr. Guy for a violation of §810.08, Fla. Stat.

Sisley, citing Porter v. State, 582 So.2d 41 (Fla. 4th DCA 1991), argues that he had probable cause to arrest Mr. Guy under §843.02, Fla. Stat. "for interfering with the ... performance of his duties."  Sisley's Memo. at 13.  In Porter, the defendant was observed over time to be "acting as a lookout" and, as a result of his warning to his confederates, "the suspected drug dealers ran from the scene and escaped from the officers."  State v.

11

Dennis, 684 So.2d 848, 849 (Fla. 3d DCA 1996), which is much closer factually to Mr. Guy's case, distinguishes Porter as "vastly different." There, the defendant yelled "ninety-nine," a street term for police in the area. The court found no probable cause to arrest the defendant for obstruction of justice, however, because, unlike Porter, "there was no evidence connecting him to the drug deal and also no evidence that his yelling "Ninety-nine" resulted in the target getting away." Id.

Here, Mr. Guy has controverted all the facts, including the crucial allegation that he yelled "watch out," on which Sisley relies to prove arguable probable cause. Moreover, in his own affidavit, Sisley concedes that Mr. Guy's alleged warning did not frustrate his ability to confront the scalpers ("After dealing with the sellers [of the tickets], I approached Plaintiff ...." Sisley Aff., ¶9).

Nor could Mr. Guy's alleged evasiveness or refusal to identify himself – both of which allegations Mr. Guy also denies – supply arguable probable cause. Section 843.02 does not require a person to verbally cooperate or identify himself until after that person is legally detained. Burdess v. State, 724 So.2d 604 & n.1 (Fla. 5th DCA 1998); D.G. v. State, 661 So.2d 75, 76 (Fla. 2d DCA 1995).

**6.**

### Sisley lacked arguable probable cause to arrest Mr. Guy for a violation of §810.08, Fla. Stat.

Because Sisley would have lacked arguable probable cause to detain Mr. Guy even if Mr. Guy had warned a group of ticket resellers to "watch out," he necessarily lacked probable cause to order Mr. Guy to leave the Stadium and arrest him for trespass because

of that factually and legally irrelevant warning.  The case of J.G.D. v. State, 724 So.2d 711 (Fla. 3d DCA 1999), is instructive.

In J.G.D., a juvenile was arrested and adjudicated delinquent for failing to obey a police order to leave an apartment complex where he was visiting a tenant.  "The order followed J.G.D.'s loud and profane, but ... non-violent, protest of police actions in investigating a burglary and an ensuing disturbance at the building."  Id.  Since J.G.D.'s verbal protest was not "cognizable wrongdoing," and "a trespass charge was abandoned," "the order to leave and therefore the arrest for failure to obey that order were each unlawful."  Id.

While in Mr. Guy's case the trespass charge was not abandoned, an equally vital link in the chain of probable cause to arrest – a charge against Mr. Guy for participating in ticket scalping – was abandoned.  When Mr. Guy asked Sisley why he had been arrested and denied being a ticket scalper, Sisley "adamantly" replied:

> I did not arrest you for that, I want it to be clear!  I arrested you
> for trespassing.

Guy Aff. ¶25.  Sisley gave Mr. Guy an order ('enter the Stadium or leave the premises') that was not legally justifiable and, as in J.G.D., arrested him for disobeying that order. Indeed, Mr. Guy was arrested as much for refusing Sisley's order to go into the Stadium – the very opposite of trespassing – as he was for failing to leave the premises if he did not enter the Stadium!

J.G.D. is also instructive in the warning it gave to landlords (and other property possessors or managers such as the Stadium in this case):

> A landlord who arrests and prosecutes a person for trespass
> without inquiring as to whether the person had a right to be on

the premises pursuant to invitation by a tenant does so at his
own risk.

Id. at 712 (quoting Arbee v. Collins, 219 Ga. App. 63, 65, 463 S.E.2d 922, 925 (1995)).

Here, Mr. Guy was invited to Pro Player Stadium by the Miami Dolphins football team. By

analogy to J.G.D., the Miami Dolphins were a type of tenant, and the Stadium merely the

landlord. Sisley has failed to prove that he was authorized by the Miami Dolphins, the

'tenant' whom Mr. Guy, a Miami Dolphins season ticket holder, came to visit, to order Mr.

Guy to leave or to arrest him for trespass under the circumstances present here.

WHEREFORE, Robert Sisley's motions to dismiss and for summary judgment on

qualified immunity grounds must be denied.

Stephen L. Malove, Esq.
Malove & Kaufman, P.A.
Penthouse
48 East Flagler Street
Miami, FL 33131
(305) 577-0077

and

Lawrence & Daniels
21st Floor
100 North Biscayne Boulevard
Miami, FL 33132
(305) 358-3371

By: _____
    Adam Lawrence
    FBN 188175

14

## Certificate of Service

I Hereby Certify that a true copy of the foregoing was mailed to Michael Rotunno, Esq., Marlow, Connell, Valerius, et al., Grove Professional Building, 2950 S.W. 27th Avenue, Suite 200, Miami, Florida 33133, attorneys for defendants Dolphins, Football and Stadium, and James Allen, Esq., County Attorney's Office, 111 N.W. 1st Street, Suite 2810, Miami, Florida 33128, attorneys for Miami-Dade and Sisley, this *24* day of March, 2000.

Stephen L. Malove
FBN 305553

STATE OF FLORIDA     )
                              )ss:

COUNTY OF DADE     )

## AFFIDAVIT OF MASHAAN GUY

**BEFORE ME**, the undersigned authority, personally appeared Mashaan Guy, who after being duly sworn states:

1.      My name is Mashaan Guy, and I am over the age of 18.

2.      At all times material, I have been a season ticket holder of the Miami Dolphins since approximately 1995. Since 1996, I have always had the same seats, namely, seats 20 and 21 of Section 107.

3.      On December 21, 1998, I went to Pro Player Stadium with the intention of seeing a Monday night football game between the Denver Broncos and the Miami Dolphins.

4.      I parked my car at the Golden Glades interchange which was my routine. I took the shuttle bus from the Golden Glades interchange parking lot to Pro Player Stadium. The shuttle bus dropped me off at or near Gate B. I walked from Gate B to Gate H.

5.      I was planning to meet my friend, Ronnie Smith, to go to the game. Since I first purchased season tickets from the Miami Dolphins, either my wife Jacqueline Guy or Mr. Smith accompanied me to the games. I am an avid and loyal Dolphins fan and have attended mostly every Dolphins home game since I purchased my season tickets.

6.      There was a lot of activity occurring in the parking lot of Pro Player Stadium that evening. I observed tailgate parties, interactive games, face painters and clowns, exhibits, and many tents.

7.    While I was waiting for my friend Ronnie Smith, on the sidewalk located outside of Gate H at Pro Player Stadium, a police officer, who I later learned to be Robert Sisley, approached me and told me to leave.

8.    Mr. Sisley told me, "I know what you are doing, I don't like what you are doing and get out of here."

9.    I told Mr. Sisley that I had no idea what he was talking about.

10.    I also advised Mr. Sisley that I was a season ticket holder and that I was waiting for a friend to go into the game.  I showed Mr. Sisley my tickets, and he said, "I don't care, get out of here."

11.    I asked Mr. Sisley to explain what he meant, and he replied, "I don't like what you are doing, I know what you are doing; you either leave the premises or enter the stadium."  At no time did Mr. Sisley state, "that I would either have to leave the property or be arrested for trespassing."

12.    I subsequently learned that I was accused of warning ticket scalpers that Mr. Sisley was coming.

13.    At no time was I involved in the selling of tickets to the football game.

14.    At no time did I ever warn or attempt to warn any individuals who may have been scalping tickets.  At no time did I call out, "watch out" to anyone.

15.    I advised Mr. Sisley that I was waiting for my friend, Ronnie Smith, and that I could not leave because my car was parked at the Golden Glades interchange and the shuttle bus did not take people back to the parking area until after the game.  At no time did I tell Mr. Sisley that I was parked in the northwest area of the stadium grounds.  At no

2

0time was I evasive to Mr. Sisley.  I had done nothing wrong and I answered his questions directly and honestly.

16.    Because I was waiting for my friend, Ronnie Smith, as I had his ticket and because the shuttle bus was unavailable, I was not able to leave the premises or enter the game.

17.    At that point, Robert Sisley placed me under arrest.  I was totally compliant and passive.    Nevertheless, Mr. Sisley grabbed me around my neck with his arm and placed me in a choke hold.  With his other hand he reached for his handcuffs, handcuffed one of my wrists, then pulled my other arm behind my back and handcuffed the other wrist. Mr. Sisley applied much force and hurt me.  Mr. Sisley then pulled back painfully on the handcuffs, forcing my back to arch backwards.  I told Mr. Sisley that the handcuffs were too tight and cutting into my wrists.  Mr. Sisley responded, "Tough, they're not built for comfort."

18.    I had only one encounter with Mr. Sisley and that occurred at Gate H.

19.    At no time during the events described above were any police officers present other than Mr. Sisley.

20.    Mr. Sisley then summoned another police officer by radio.  The other police officer arrived on a golf cart.  Mr. Sisley using force pushed me down in the back seat of the golf cart. I was driven to an area of the stadium where there was a holding cell.  There were at least a half a dozen uniformed officers stationed at the holding cell located inside the stadium.

3

21.    Once I arrived at the holding cell, Mr. Sisley, who had been following the golf cart on bicycle, arrived and forcibly sat me on a bench while I was still handcuffed.  He then went to retrieve some paperwork.

22.    While I was seated, I leaned forward as far as I could to attempt to relieve the severe pain that I was feeling from the handcuffs.

23.    Thereafter, Mr. Sisley returned.  After talking to several officers in my presence, he asked me for identification for the first time.  He had never asked me for identification at any time before I was seated in the holding area.

24.    Mr. Sisley asked me my name for the first time and I told him, "Mashaan Guy."  Mr. Sisley ordered me to stand up, asked me if I had any weapons or drugs to which I replied, "No,"  went into my pockets and removed my keys, portable phone, football tickets and approximately $30.00 cash.

25.    I then observed Mr. Sisley writing some sort of report and I asked him why he had arrested me.  I told him that I was not a scalper, and he adamantly replied, "I did not arrest you for that, I want it to be clear!  I arrested you for trespassing."  I denied the charges, and again told Mr. Sisley that I was a season ticket holder.  I said to Mr. Sisley, "Officer, you are making a mistake."  He replied, "Tough, I make them everyday."  Mr. Sisley, to my knowledge, made no attempt to investigate my claims of innocence.

26.    Thereafter, Mr. Sisley asked me my address and other biographical information and I provided him the information requested.

27.    At that point, I observed Mr. Sisley watching the football game for a few minutes on a television located at or near the holding cell, and he radioed for a "wagon".

4

I heard a voice over the radio say, "We are busy, I will be there within thirty minutes." Mr. Sisley then replied, "10-4."

28.    Again, I asked Mr. Sisley to loosen the handcuffs because they were cutting into my wrists and my shoulder was hurting.  I told Mr. Sisley several times that it felt like my shoulder was coming out of its socket and my fingers were tingling. He refused to loosen the handcuffs, saying, "I already told you.  I gave you that answer."  I had now been in severe pain from the handcuffs for well over one hour.  Mr. Sisley intensified the pain from the handcuffs while leading me around during the entire encounter.  I had to arch my back to try to relieve the pain during these times.  During the entire encounter, Mr. Sisley acted angrily, rudely, vengefully and harshly.

29.    Approximately thirty to forty minutes later, other officers arrived. I was stood up and escorted outside of the holding cell.  There was a white van parked with caged windows.  I was taken to the van, the door was opened and I was escorted into the van where there were other individuals who were also handcuffed.  I was required to sit with other prisoners.  A guard finally loosened my handcuffs.  I had been in extreme pain in my wrist and shoulder for approximately two hours at this point.

30.    The van then transported me to a waiting bus where the handcuff on one wrist was removed and I was then handcuffed to another prisoner.  I was then ordered to get onto the bus and sit down.

31.    Later, the bus transported me and the other prisoners to another building. I requested to go to the bathroom, but was refused.

32.    My name was called and I was told to get off the bus.  I was told to lineup

5

behind the other prisoners, my name was called again, and I was ordered to step forward. The handcuffs were removed for the first time. There were deep red groves still visible from before the handcuffs had been loosened. I was told to undress. I took off my shoes, my pants, my shirt and an officer searched them.

33.     I was then photographed. I was told to get dressed, I was handcuffed again and instructed to get back on the bus.

34.     After everyone was processed, I was then transported to the Dade County Jail. All of the prisoners got off the bus in line. I was photographed again and then sent to the lockup.

35.     I was taken from cell to cell and finally, I was fingerprinted. I was then taken to another cell where I remained. I requested to make a phone call. I was advised that no phone calls could be made for at least four hours.

36.     When I was finally able to make a phone call, I contacted my friend, Ronnie Smith and I requested that he bring $250.00 cash for my bail.

37.     Mr. Smith came to the Dade County Jail. Notwithstanding, I was released on my own recognizance. Thereafter, Mr. Smith took me to the Golden Glades interchange to retrieve my vehicle.

38.     Subsequently, I was prosecuted by the Dade County Attorney and eventually all charges were dropped.

39.     My wrists were reddened and sore for days where the handcuffs had been applied. My shoulder hurt for a considerable period of time. While the constant pain has gone away, my shoulder is just not the same since the incident. I have continued to suffer

6

from feelings of depression and humiliation from the incident.


**FURTHER AFFIANT SAYETH NAUGHT.**

_____
MASHAAN GUY


**STATE OF FLORIDA**          )
                             )ss:
**COUNTY OF DADE**            )

      **BEFORE ME**, the undersigned authority, this day personally appeared **MASHAAN**

**GUY**, who being personally known to me or has produced _____

as identification, who being by me first duly sworn, deposes and says that he executed the

foregoing Affidavit is true and correct to the best of his knowledge and belief.

      **WITNESS** my hand and official seal at Miami, Dade County, this 23rd day of March,

2000.

_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

```
OFFICIAL NOTARY SEAL
CAROL LAMONT
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC869971
MY COMMISSION EXP. SEPT 8,2003
```

7

**STATE OF FLORIDA**  )
                     )ss:
**COUNTY OF DADE**     )

### AFFIDAVIT OF JACQUELINE GUY

**BEFORE ME**, the undersigned authority, personally appeared **JACQUELINE GUY**, who after being duly sworn states:

1.    My name is Jacqueline Guy, and I am over the age of 18.

2.    I am married to Mashaan Guy.

3.    My husband, Mashaan Guy has been a season ticket holder of the Miami Dolphins since approximately 1995.

4.    Over the past five years, either my husband's friend Ronnie Smith or I accompanied my husband to the games.

5.    Based on my personal knowledge, on December 21, 1998 my husband, Mashaan Guy had planned to go to a Monday night football game between the Miami Dolphins and the Denver Broncos at  Pro Player Stadium, and was to meet his friend Ronnie Smith at the game.

6.    Prior to this particular game, when my husband had attended Monday night football games at Pro Player Stadium in the past he usually arrived home at approximately midnight  or shortly thereafter.

7.    On December 21, 1998 at approximately midnight, my husband had not yet arrived home and I fell asleep.

8.    The next morning, at approximately 7:30 a.m. I was awakened by my husband who had arrived home.  When I saw my husband's face, I knew that something was wrong.  He appeared frightened, disheveled, upset and distraught.  My husband was

still dressed in the same attire that he was in when he left home the evening before.

9.　　My husband complained of pain in his wrists and in his shoulder. I looked at his wrists and saw deep red grooves where apparently handcuffs had been placed. My husband also appeared depressed, haggard, exhausted and injured.

10.　　As days progressed, my husband continued to complain of pain in his wrists and pain in his shoulder. Eventually, the pain in the wrists subsided; however, my husband still complains of pain in his shoulder to this day.

11.　　Further, I have observed that my husband has been emotionally scarred by the events that took place at Pro Player Stadium. He is not the same man. He has many sleepless nights, nightmares, re-lives the experience and is haunted by the events that took place.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
JACQUELINE GUY

**STATE OF FLORIDA**　　　　)
　　　　　　　　　　　　　　　　)ss:
**COUNTY OF DADE**　　　　　　)

**BEFORE ME**, the undersigned authority, this day personally appeared **JACQUELINE GUY**, who being personally known to me or has produced _____ as identification, who being by me first duly sworn, deposes and says that he executed the foregoing Affidavit is true and correct to the best of her knowledge and belief.

2

**WITNESS** my hand and official seal at Miami, Dade County, this 23rd day of March,

2000.

_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

OFFICIAL NOTARY SEAL
CAROL LAMONT
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC869971
MY COMMISSION EXP. SEPT 8,2003

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

BROWARD DIVISION

CASE NO. 00-6121-CIV-DIMITROULEAS

Magistrate Judge Johnson

MASHAAN GUY, and JACQUELINE
GUY,

       Plaintiffs,

vs.

MIAMI-DADE POLICE DEPARTMENT,
f/k/a METRO-DADE COUNTY POLICE
DEPARTMENT; SOUTH FLORIDA STADIUM
CORPORATION, d/b/a PRO PLAYER
STADIUM; MIAMI DOLPHINS, LTD.; SOUTH
FLORIDA FOOTBALL CORPORATION,
General Partner of Miami Dolphins, Ltd.;
and ROBERT SISLEY,

       Defendants.

_____/


**STATE OF FLORIDA**     )
                       )**ss:**

**COUNTY OF DADE**      )

### AFFIDAVIT OF STEPHEN L. MALOVE

    **BEFORE ME,** the undersigned authority, personally appeared Stephen L. Malove,

who after being duly sworn states:

    1.     My name is Stephen L. Malove.

    2.     I am the attorney for the Plaintiffs, Mashaan Guy and Jacqueline Guy in the

above-captioned matter.

3.      Defendant, Miami-Dade County Police Department filed a List of Documents and Witnesses and served same on the undersigned on or about February 17, 2000.

4.      Attached to said List of Documents and Witnesses is a document on "Pro Player Stadium" stationary signed by Todd A. Ellzey, Director of Event Operations and Security.  A copy of said document is attached hereto as Exhibit "A".

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
STEPHEN L. MALOVE, Affiant

**STATE OF FLORIDA**          )
                             )ss:
**COUNTY OF DADE**            )

**BEFORE ME**, the undersigned authority, this day personally appeared **STEPHEN L. MALOVE**, who being personally known to me, being by me first duly sworn, deposes and says that he executed the foregoing Affidavit is true and correct to the best of his knowledge and belief.

**WITNESS** my hand and official seal at Miami, Dade County, this 24th day of March, 2000.

_____
NOTARY PUBLIC
State of Florida

My Commission Expires:

```
OFFICIAL NOTARY SEAL
CAROL LAMONT
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC869971
MY COMMISSION EXP. SEPT 8,2003
```

2

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing instrument has been mailed on this _24_ day of _MArch_____, 2000 to: **Michael Rotunno, Esq.**, Marlow, Connell, et. al., Grove Professional Building, 2950 SW. 27 Avenue, Suite 200, Miami, Florida 33133 and **James Allen, Esq.**, County Attorney's Office, 111 NW 1st Street, Suite 2810, Miami, Florida 33128.

MALOVE & KAUFMAN, P.A.
Attorneys for Plaintiffs
48 East Flagler Street - PH 104
Miami, Florida 33131
(305) 577-0077 - Telephone
(305) 373-6116 - Facsimile

BY: _____
Stephen L. Malove
Florida Bar No.: 305553

3



TO WHOM IT MAY CONCERN:

METRO-DADE POLICE DEPARTMENT OFFICERS ARE AUTHORIZED REPRESENTATIVES TO ENFORCE FLORIDA STATE STATUTE SECTION 810.09, TRESPASS, AND TO WARN AND DIRECT PERSONS TO LEAVE PRO PLAYER STADIUM AND ITS PARKING LOT, LOCATED AT 2269 N.W. 199TH STREET, MIAMI, DADE, FLORIDA.

AUTHORITY IS GRANTED BY SOUTH FLORIDA STADIUM CORPORATION, WHO IS THE OWNER/LESSEE OF SAID BUSINESS, AND PROPERTY, AND WHO HEREIN REQUESTS THE OFFICERS TO ENFORCE SAID STATUTE ON SAID PROPERTY INCLUDING THE PARKING LOTS.

IT IS ALSO ACKNOWLEDGED THAT THIS WRITER WILL AID IN THE PROSECUTION OF THOSE PERSONS ARRESTED.

SOUTH FLORIDA STADIUM CORPORATION

BY: _____
　　TODD A. ELLZEY
　　DIRECTOR OF EVENT OPERATIONS
　　AND SECURITY

STATE OF FLORIDA, COUNTY OF DADE
SWORN TO AND SUBSCRIBED BEFORE ME
THIS _3 1st_ DAY OF _December_, 19__

TODD A. ELLZEY IS KNOWN PERSONALLY TO ME.

_____
NOTARY: ELLEN M. KELLY

_ELLEN M. KELLY_
PRINT NAME OF NOTARY

MY COMMISSION EXPIRES:

OFFICIAL NOTARY SEAL
ELLEN M KELLY
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC617123
MY COMMISSION EXP. SEPT 19,1998